Zoila **SANTOVENIA** and Lorenzo Santovenia, etc., Plaintiffs-Appellants,

v.

**CONFEDERATION LIFE ASSOCIATION**, etc., Defendant-Appellee.

No. 71–2928.

United States Court of Appeals, Fifth Circuit.

May 31, 1972.

**806**

James M. Henderson, Malcolm Lewis Kneale, Miami, Fla., for plaintiffs-appellants.

Phillip G. Newcomm, Miami, Fla., for defendant-appellee.

Before TUTTLE, GEWIN and THORNBERRY, Circuit Judges.

TUTTLE, Circuit Judge:

This action was brought by Cuban nationals now residing in Florida to recover in dollars the proceeds of a life insurance policy issued in Cuba which by its terms was payable in Cuba and in Cuban pesos. The district court, finding that the insurance contract was governed by Cuban law and that under Cuban law plaintiffs could recover only in Cuba and in pesos, entered summary judgment in favor of defendant insurance company. We affirm the judgment of the district court for the reasons stated in its thorough opinion, reprinted below.

We would add only the following. Plaintiffs, as the beneficiaries of the life insurance policy here involved, sought recovery on the policy in *dollars* and in *Florida*. Under the facts of this case there is little question that if they were entitled *to* recovery, such recovery could *not* have been in dollars for the face amount of the policy, but rather in pesos or the dollar equivalent thereof. It is noted that when this insurance contract was made in 1949 Cuba had a dual currency law which in effect permitted the use of American dollars and Cuban pesos interchangeably, subsequently altered in 1951 to provide that pesos alone were to serve as the national currency. However, the policy was written in terms of pesos and the insured, by his own choice, paid the first and every succeeding premium in pesos. Thus, the policy from its inception contained mutual obligations in pesos which would have been unaffected by the subsequent change in the currency laws.

Moreover, the contract itself provided "all eligible and payable sums covered under this policy should be covered under the monetary unit of the Cuban Government which has legal tender, when any payment is treated." Plainly the parties here agreed in advance that any change in the currency laws would be binding on each of them and as a consequence, after 1951 the policy, by express agreement of the parties, was payable in pesos alone.

This contractual agreement takes on added significance when it is recognized that in 1948, prior to the making of the contract, Cuban Law No. 13 was passed which provided that beginning one year after the Banco Nacional de Cuba should commence operations the currency of the United States would cease to be legal tender and to have debt redeeming force in Cuba. It was thus foreseeable to the parties that pesos would eventually become the sole national currency of Cuba, though the exact date was unknown. Therefore, the contract was written in such a manner as to ensure that when Law No. 13 took effect, pesos would automatically become the exclusive medium of the contract. This occurred on June 30, 1951, pursuant to Decree No. 1384.[1]

 It being plain that plaintiffs would be entitled to recover only the face amount of the policy as expressed in pesos, the sole remaining issue here is whether plaintiffs, under Florida law, could sue and recover in Florida even though the policy, by its terms was to be performed in Cuba.

As to that issue the Florida courts have reached varying conclusions, depending on the factual situation. In Confederation Life Association v. Conte, 254 So.2d 45 (DCA 3d, 1971) the District Court of Appeal said:

"The Association cannot escape from its obligation by attempting to require a Cuban resident who has fled to the U.S.A. for his safety or life to return to Cuba to collect money obviously due

under an insurance policy. Such conduct is clearly inequitable; cannot be countenanced and *constitutes a breach of contract.* Insurance contracts are transitory and the insured may sue, as here, in a jurisdiction other than where the policy was issued, or is to be performed." at 46. (Emphasis supplied).

The court held, therefore, that judgment should be for the plaintiff in the dollar equivalent of the pesos due to him. We note, however, that plaintiff in that case specifically alleged:

"that because a communist revolutionary government seized power in Cuba in 1959 and because plaintiff was classified as an enemy of the state by that government, . . . the plaintiff was forced to flee Cuba; that plaintiff could not return to Cuba because of fear for his life or imprisonment as an enemy of the state; that any sum payable to him in Cuba would be immediately confiscated by the Cuban government and it would be a futile act to attempt to accept payment in Cuba." Id.

 In the case before us plaintiffs neither alleged nor attempted to prove that they could not go to Cuba or that they were political enemies of the state. We cannot take judicial notice of any such set of facts. Therefore, the equitable considerations which led the Florida court in Conte to decide as it did do not appear on this record.[2]

---

1. Under these circumstances this case is factually distinguishable from deLara v. Confederation Life Association, 257 So.2d 42 (Fla.1971) in which the Florida Supreme Court permitted plaintiffs similarly situated to recover the face amount of an insurance policy in dollars. There the policy was issued in 1938, prior to the monetary decree of 1948, and was expressly payable in "lawful currency of the United States." Thus, unlike the insurance contract here, the deLara policy was drawn up without reference to an impending change in the monetary laws of Cuba and created mutual obligations in *dollars*, not in pesos.

2. We note that in deLara v. Confederation Life Association, n. 1, supra, the Florida Supreme Court, in allowing recovery on a policy providing for payment in Havana, Cuba, stated that the trial court had recognized "that the international situation had not materially changed since the rendition of the Vega decision [Confederation Life Association v. Vega y Arminan, 207 So.2d 33 (DCA 3d, 1968)]. He well knew Cuban nationals who are refugees in the United States are still severely handicapped in their free access to visit, trade or conclude business matters in Cuba in Cuban currency, or with resident Cuban citizens

Rather, we think, this case is controlled by the Florida Supreme Court's decision in Confederation Life Association v. Ugalde, 164 So.2d 1 (Fla.1964), cert. denied 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964). There the court held:

"The petitioner having, upon demand, offered to make payment of the cash surrender value of the policy in accordance with the terms of the contract and the law of Cuba, which governs it, in Cuban pesos in Havana, there was no breach of contract and no cause of action against the petitioner." at 2.

The proceeds of the insurance contract here at issue were to be paid in pesos from defendant's branch office in Havana, Cuba. Plaintiffs have failed to show that defendant refuses to make payment in accordance with these specific terms of the policy and, thus, we are of the view that, under Ugalde [3], there has been no breach of the contract and that there is no cause of action against defendant in the courts of the United States.

The judgment is affirmed.

## APPENDIX

[314]

In the United States District Court in and for
the Southern District of Florida
Miami Division

Case No. 70–688–Civ–CA

Zoila Santovenia and Lorenzo Santovenia, individually and as widow and surviving son respectively of Emeterio Santovenia Echaide, and as legal heirs and administrators of his estate,

Plaintiffs,

—vs—

Confederation Life Association,
a Canadian insurance corporation,

Defendant.

Filed August 18, 1971

## SUMMARY JUDGMENT

## OPINION OF THE COURT

———◆———

or business concerns therein." 257 So.2d at 44. It does not appear from the opinion whether plaintiffs in that case alleged that they could not return to Cuba, but, since the court found that the policy was payable in dollars, such an allegation became unnecessary. Plaintiffs there could not, as the policy specified, have obtained a dollar recovery in Havana, Cuba, because Cuban currency laws forbade payments in currency other than pesos. Thus, in order to give effect to the company's *dollar* obligation the court, in equity, permitted recovery in the United States where dollars are legal tender. In the case before us, of course, the contract provides for payment in pesos in Havana, Cuba and since pesos are legal currency in Cuba, plaintiffs must otherwise affirmatively demonstrate that the place of payment provision should be disregarded. This they have failed to do.

3. We reject the argument that the Ugalde decision is no longer viable in light of the fact that Cuba withdrew from the International Monetary Fund Agreement subsequent thereto. The IMFA was one of two grounds for that decision, the second being no breach of contract, and upon Motion for Reconsideration of the case *after* Cuba had withdrawn from the Fund, the Florida Supreme Court so held.

Plaintiffs filed this action against defendant seeking declaratory relief and, alternatively, judgment in the sum of $22,408.00, upon a general allegation that they became entitled thereto in accordance with a contract of insurance that was attached to the complaint as an exhibit. Defendant, Confederation Life Association, answered the complaint denying certain allegations and admitting others and setting forth certain affirmative defenses. On April 30, 1971, Defendant filed a motion for summary judgment supported by affidavits on the grounds that there was no genuine issue as to any material fact and that defendant was entitled to a judgment as a matter of law.

Oral argument was held on defendant's motion for summary judgment, and the parties submitted briefs in support of their respective contentions.

In disposing of the motion for summary judgment, it appears from the record herein that there is no dispute as to the following material facts:

## [315] STATEMENT OF FACTS

1. On May 30, 1949, the insured, Emeterio Santovenia Echaide, a Cuban citizen and domiciliary applied for the insurance policy involved herein. His application, which was in the Spanish language and was executed in Cuba, provided, among other things, that the insurance contract would become effective upon delivery of the insurance policy and payment of the first premium. The policy applied for was a whole life policy for a sum assured of 22,408.00 pesos and requiring the payment of an annual premium of 1,747.37 pesos so long as the life insured lived.

2. The insurance policy by its terms provides that all sums payable or due thereunder shall be paid in the national currency of Cuba at the offices of the defendant in Havana, Cuba.

3. The aforesaid insurance policy was delivered to the insured in Cuba, and it was there that he paid in pesos the first and all subsequent premiums in connection with such policy.

4. The insured died in Miami, Dade County, Florida, on November 19, 1968. Plaintiffs, who are the heirs at law of the insured and the beneficiaries under the aforesaid insurance policy, demanded that the defendant pay the death benefits under the policy in the United States in U. S. dollars. Defendant refused to make such payment.

5. The defendant has been in the life insurance business in Cuba continuously since 1908 and, while it ceased issuing new policies in Cuba on or about June 1960, still maintains a Branch Office in Havana where its existing policies are still serviced by the receiving of premium payments and the making of claim and other payments required by the Defendant under its [316] Cuban policies.

## ISSUES IN CONTROVERSY

The parties have raised and fully discussed the following issues:

1. Law applicable, whether Cuban or Florida law.

2. Applicability or not of the doctrine of unjust enrichment.

3. Effect of Cuba's withdrawal from the International Monetary Fund Agreement.

## DISCUSSION

The subject matter jurisdiction of this Court, based upon diversity of citizenship, has not been disputed. Under these circumstances, this Court must sit as a local court with respect to a determination of the relevant legal principles. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). To the extent that the determinative legal question is considered to be one of conflicts of laws, this Court must apply the conflicts rule of Florida. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

The Florida cases leave no doubt in my mind that a Florida court would hold, as a matter of conflicts, that plaintiffs' claim is governed by Cuban law.

In Confederation Life Association v. Vega y Arminan, 207 So.2d 33 (DCA 3rd 1968), the appellate court recently observed that "While there exist no authority in Florida which specifically rejects other tests, it has been held that the lex loci contractus is preferable," citing Brown v. Case, 80 Fla. 703, 86 So. 684 (1920). It is clear that the appellate court was using the term lex loci contractus generally as meaning not only the place where a contract is made but also the place where it is [317] to be performed. The court in Brown v. Case, supra, stated that " 'the nature, validity and interpretation of contracts, are to be governed by the lex loci of the country where the contracts are made or are to be performed. . . .' " 86 So. at 685.

It cannot be gainsaid that the insurance contract herein was made in Cuba. In Equitable Life Assur. Soc'y of the United States of America v. McRee, 75 Fla. 257, 78 So. 22 (1918), the Florida Supreme Court held that:

"A life insurance policy which by its terms does not become a completed contract until delivery on payment of first premium is to be construed as a contract made in the state where the first premium is paid. . . . Northwestern Mut. Life Ins. Co. v. McCue, 223 U.S. 234, 32 Sup.Ct. 220, 56 L.Ed. 419, 38 L.R.A. (N.S.) 57. . . ." 78 So. at 24.

Here, by his application, which was incorporated in the contract of insurance, the insured agreed, inter alia, that:

"Should a policy be issued in virtue of this application, such policy shall not be deemed delivered or held to be binding on the Association until the first premium thereon shall have been paid to a duly authorized agent of the Association, and the policy itself shall have been actually received by me personally or by my authorized agent, during the lifetime and good health of the person whose life is to be insured."

The policy herein was, in fact, delivered to the insured in Cuba conse-quent upon his payment of the first premium thereon in Cuba. Therefore, it is to be construed as a contract made in Cuba.

It is equally clear that the insurance contract herein is to be performed in Cuba. The defendant and the insured expressly stipulated that all payments under the policy were to be made in Havana, Cuba; and consistent therewith, that is where the insured made all of his premium payments in pesos.

As long ago as Walling v. Christian and Craft Grocery Co., 41 Fla. 479, 27 So. 46, 49 (1899), the Supreme Court of [318] Florida expressly adopted the rule "that matters bearing upon the execution, interpretation, and validity of a contract are determined by the law of the place where it is made. Matters connected with the performance are regulated by the law prevailing at the place of performance." This rule was reaffirmed in Castorri v. Milbrand, 118 So. 2d 563 (DCA 2d 1960), and again in Buenger v. Kennedy, 151 So.2d 463 (DCA 2d 1963). In the Walling case, the Supreme Court of Florida quoted with approval, and adopted as the Florida rule, the holding of the United States Supreme Court in Scudder v. Union National Bank, 91 U.S. 406, 23 L.Ed. 245 (1875). In that opinion the Supreme Court of the United States expressly declared that "for the purposes of payment, and the incidents of payment," the law of the place of performance is controlling. 91 U.S. at 412.

Thus, under the rule in force in Florida, the law of the place of performance —in this case, Cuba—governs matters relating to the performance, including the currency in which payment is to be made.

In this particular case, it is clear that Cuban law, by virtue of certain special legislation, requires that payment under the insurance contract herein be made in Cuban pesos in Havana, Cuba.

On or about July 1, 1951, the Government of Cuba enacted and put into effect Decree No. 1384. Law No. 568 was enacted and became effective on or

about October 2, 1959, in Cuba, and Law No. 930 was enacted and became effective in Cuba on or about February 23, 1961. The said laws and decrees are generally known as the Cuban Monetary Control Laws, and have the effect of requiring that all obligations payable in Cuba be paid in Cuban pesos.

[319] Thus, this Cuban legislation clearly requires that payment by the defendant be made in pesos, the Cuban legal tender currency, and in Havana, Cuba.

■ I do not think the equitable doctrine of unjust enrichment compels a different result. That principle of quasi contract is not applicable to agreements deliberately entered into by the parties. The decision here is based upon the applicable law and the terms of the contract. To require the defendant to pay the death benefits under the policy in U. S. dollars in the United States would be tantamount to writing a new contract for the parties, and this, under the circumstances, I am not free to do. In Moylan v. Estes, 102 So.2d 855 (DCA 3d 1958), the appellate court stated the rule as follows:

> ". . . where the parties have made an express contract, the court should not find a different one by 'implication' concerning the same subject matter if the evidence does not justify an inference that they intended to make one."

Here, there is no evidence that the parties to the insurance contract sued upon have, by their conduct, indicated any intention to make a different one, viz. obliging defendant to pay in U.S. dollars in the United States.

Plaintiffs have advanced the argument that the withdrawal of Cuba from the International Monetary Fund Agreement means that payment must be made by the insurance company in U.S. dollars in the United States, and not in Cuban pesos in Cuba. In support of their contention, they rely upon Confederation Life Association v. Vega y Arminan, supra. I find no substance to their contention. In this case, neither Cuba's participation in the International Monetary Fund Agreement nor its subsequent withdrawal therefrom affect in any way the application of the con- [320] flict of laws rule in force in Florida.* The application of that rule, as we have already seen, deems the insurance contract herein a Cuban contract, having its situs in Cuba. Contrariwise, in Vega, the appellate court, through the use of a second contract rationale, found that the situs of the cash surrender option contract was in Florida. The Court's finding as to situs was manifestly the pivotal one upon which its holding turned. It obviously influenced the Court in assessing the importance of Cuba's withdrawal from the International Monetary Fund Agreement, and it seems to be inextricably related to the Court's conclusion that ". . . the laws of a nonmember nation are not given extraterritorial effect . . ." 207 So.2d at 38.

Here, however, unlike the Vega situation, we have a Cuban contract governed by Cuban law. So viewed, the question is merely whether a Florida court would give effect to the Cuban law which manifestly governs this contract or whether it would refuse to do so on grounds of Florida Public policy. This question was layed to rest by the decision in Confederation Life Association v. Ugalde, supra, as follows:

> "Appellee argues that the contract is governed by the law of Florida, and that it would be against the public policy of the State of Florida to recognize and enforce in behalf of the de-

---

* In Confederation Life Association v. Ugalde, 151 So.2d 315 (DCA 3rd 1968), Judge Carroll concluded, without aid or mention of Cuba's subscription to the International Monetary Fund Agreement, that Cuban law governed the insurance contract. He reached that conclusion by the application of the conflicts rule in force in Florida.

fendant insurance company the right, as conferred by Cuban law, to discharge the obligation in pesos.

\* \* \* \* \* \*

"The argument that the Cuban government, in providing a uniform currency and making obligations of contracts payable there dischargeable in its designated legal tender, was [321] taking action repugnant to the policy of this country, is wholly without merit. There is no Florida Statute defining a policy on which the court could deprive the defendant of its rights under the Cuban contract as such rights are fixed and determined under Cuban law. But even were there such a statute, its effectiveness would be open to question. See Home Insurance Co. v. Dick, supra [281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926]; Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., supra [292 U. S. 143, 54 S.Ct. 634, 78 L.Ed. 1178]; Clay v. Sun Insurance Office Ltd., supra [363 U.S. 207, 80 S.Ct. 1222, 4 L. Ed.2d 1170]; Holderness v. Hamilton Fire Insurance Co. of New York, supra [D.C., 54 F.Supp. 145]. Not only is there an absence of any Florida law or policy against a sovereign nation prescribing its legal tender and making all obligations payable there dischargeable only therein, but the same process when employed by the United States government in 1933 was held by our Supreme Court to be dictated by our government's policy favoring it."

Nor was the import of the quoted holding on the question of public policy unearthed by the subsequent decision in Confederation Life Association v. Vega y Arminan, supra. There is nothing said in the Vega opinion to indicate that, had the option contract been found to be a Cuban contract with its situs in Cuba, the Court would have nevertheless granted relief to the plaintiff consequent upon declaring the Cuban currency legislation contrary to Florida's public policy. It is interesting to note, in this connection, that a federal court has recently held that these Cuban currency laws do not contravene the public policy of New York. Johansen v. Confederation Life Association, 312 F.Supp. 1056 (D.C.1970). There, in a case which dealt with issues similar to those presented herein, the Court said:

"In substance, the 1951 law converted dollar obligations into peso obligations because it made the peso the only legal tender in Cuba. The peculiar situation which had previously existed under which Cuba had two different legal tender currencies, the peso and the dollar, ceased to exist. I see no reason why New York public policy should be offended by giving effect to this law as binding upon both plaintiffs and defendant with respect to Cuban contracts to be performed in Cuba. New York has enforced obligations incurred [322] in foreign countries and valid there, as, for example, gambling contracts, which would seem much more likely to contravene the public policy of New York. Intercontinental Hotels Corp. v. Golden, 15 N. Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 (1964)." (Emphasis supplied)

Upon the basis of the foregoing, I conclude that it is the law of Cuba that must be applied to determine the rights of the parties under the contract on which plaintiffs have based their action. It is, therefore, clear that defendant is only obligated to pay the insurance amount to plaintiffs in Cuban pesos and in Havana, Cuba, in accordance with the very terms of the contract sued on. Plaintiffs have failed to show that the defendant has failed or refused to comply with the contract.

The basis of my decision, therefore, is that Cuban law applies to the situation and that, according to it, judgment should be entered in favor of defendant. Hence, defendant's motion for summary judgment must be granted. Judgment shall be entered accordingly.

This 17th day of August, 1971.

/s/ C. Clyde Atkins
U. S. DISTRICT JUDGE